**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

STRAIGHT PATH IP GROUP, INC.,      )
                                   )
          Plaintiff,               )
                                   )
vs.                                )    Case No. 1:13-CV-932
                                   )
BANDWIDTH.COM, INC.,               )    Hon. Anthony J. Trenga
TELESPHERE NETWORKS LTD., and      )    Magistrate Judge Ivan D. Davis
VOCALOCITY, INC.,                  )
                                   )
          Defendants.              )

## STRAIGHT PATH IP GROUP'S *MARKMAN* BRIEF

The Federal Circuit has repeatedly stated that, in almost all cases, a patent claim's plain language should control.[1]  To ensure parties follow this approach, the Federal Circuit has set a high bar for a party seeking to depart from this presumption.  This is especially true here, where the terms at issue (*e.g.*, "database" and "using the connection server") are straightforward and easy to understand.  In fact, this Court has already stated that many of the terms in these patents have an "ordinary and customary meaning" that is "readily apparent even to a layperson."  Ex. 1, *Innovative Commc'n Techs., Inc. ("ICTI") v. Vivox, Inc.*, 2012 WL 5331573, at *4, Op. at 25 (E.D. Va. Oct. 26, 2012).  Just last year, Judge Doumar expressly rejected similar efforts by prior accused infringers to impose convoluted and insupportable constructions on the patents-in-suit. *Id*.  Rather than following the Federal Circuit's guidance (or this Court's prior guidance on the construction of these patents), Defendants have elected to take a "shotgun" approach to claim construction, asking this Court to adopt overly-complicated definitions for eleven separate

---

[1] *See* Section III.1.

1

terms,[2] in hopes that one of their numerous arguments sticks.  Both the Federal Circuit and this Court have soundly rejected that approach.  By contrast, Straight Path IP Group ("SPIPG") seeks construction of just two terms—an approach which is entirely consistent with the Court's previous holding in *ICTI v. Vivox, Inc.*

Defendants' efforts to create non-infringement arguments by claim construction are unsurprising, as they will have an exceedingly difficult time challenging the validity of these patents.  The patents-in-suit have been initially examined and then fully reexamined by the Patent Office (where ***over a thousand*** prior art references were cited), and were subject to repeated litigation over the years, including in this District.  The Federal Circuit's guidance on claim construction is clear—unless very specific exceptions apply, this Court should permit the plain and ordinary meaning of these claim terms to govern.

## I.      BACKGROUND OF THE INVENTION

The inventions described in the patents-in-suit solved a key problem in using computer networks and the internet for communication—a user's address can change.  Computers run programs (or processes).  When linked to the internet, those processes have what is known as an Internet Protocol ("IP") address.  *See* Ex. 2, U.S. Patent No. 6,513,066 (the "'066 Patent") col.1 ll.32-36; Ex. 3, U.S. Patent No. 6,701,365 (the "'365 Patent") col.1 ll.29-33.  An IP address is analogous to a street address or phone number on the internet.  Just as each street address directs us to a building and each phone number directs us to a telephone on the public telephone

---

[2] Earlier this week, the Defendants had proposed over ***thirty*** terms.  When terms were proposed by the parties, counsel for SPIPG wrote to defendants asking how their briefing would be conducted. See Exs. 4 & 5.  Those requests were met with silence.  Two days before the parties' *Markman* briefs were due, Defendants Vocalocity and Bandwidth notified SPIPG that they no longer planned to seek construction of several terms and had changed their construction of other terms.  *See* Ex. 6.  Vocalocity and Bandwidth also alerted SPIPG at that time that they would file a joint brief and, SPIPG assumes, Telesphere would file a separate brief.

network, each IP address directs us to a process on the internet.  Thus, anyone wishing to initiate communication with a user must first get the IP address associated with that user.

What makes this process uniquely difficult is that, unlike a street address or a phone number, an IP address may change as often as every time a user connects to the internet.  *See* Ex. 2, '066 Patent col.1 ll.47-60; Ex. 3, '365 Patent col.1 ll.42-54.  For instance, Bob may log in from home then later a local coffee shop, his office, or a conference room at work.  As the inventors explained during prosecution of the '365 Patent, "[o]ne of the major factors inhibiting dynamic communications over the Internet, and other computer networks, is the inability to obtain the . . .  assigned network protocol address of a user process connected to the network. This problem is analogous to trying to call someone whose telephone number changes after each call."  Ex. 7, File History for the '365 Patent, Jun. 30, 1999 Amend. at p. 4.

The patents-in-suit provide an elegant solution to this long-standing problem.  If Bob wants to communicate on the internet, he creates a username (*e.g.*, bob@example.com).  From that point forward, when Bob logs on to a computer network, the software associates Bob's username (*e.g.*, bob@example.com) with his ***current*** IP address (*e.g.*, 123.45.67.89) and sends the username and/or the IP address to a server. *See* Ex. 2, '066 Patent col.5 ll.60-64; Ex. 3, '365 Patent col.5 ll.34-38.

If Alice wishes to call Bob, Alice's computer contacts the server. Ex. 2, '066 Patent col.6 ll.28-29; Ex. 3, '365 Patent col.5 ll.66-67.  The server checks to see whether Bob is on-line (via his username) and looks up the address that is currently assigned to the process Bob's computer is running.  *Id*.  Alice's computer uses the information from the server to locate Bob.  *Id*.  Alice's computer then establishes a telephone-like connection over which Alice and Bob can communicate.  *Id*.  The crux of the invention is facilitating Alice and Bob's user-to-user

communication, referred to as "point-to-point" in the patents-in-suit.   The drawings below illustrate a preferred embodiment of the invention:



| **Problem** | |
| Maybe Bob and Alice are in the same office, different houses, or across the globe. Either way, Bob has a network protocol address which may change from time to time. Alice does not know when Bob's address changes and so cannot contact him directly. | Bob<br><br>Bob's Network Protocol Address: 123.44.55.66<br><br>Alice<br>"I wish I knew Bob's address so I could contact him directly" |
| **Step 1** | |
| Bob logs on and SPIPG's system associates his network protocol address (*e.g.*, his "IP address") with his username. The software then sends the associated username and address to a server (or servers). | Username: bob@example.com<br>Network Protocol Address: 123.44.55.66<br><br>Bob   *sent via network or the internet (routers, ISPs, etc.)*   Alice |
| **Step 2** | |
| The server(s) stores Bob's information, for instance in a database. | Username: bob@example.com<br>Net. Prot. Address: 123.44.55.66<br><br>Bob   Alice |
| **Step 3** | |
| Alice wants to communicate with Bob online.  Alice logs on, and Alice's software queries the server (or servers) to determine if Bob is on-line. | Username: bob@example.com<br>Net. Prot. Address: 123.44.55.66<br><br>Query for bob@example.com<br>*sent via network or the internet (routers, ISPs, etc.)*<br><br>Bob   Alice |



This example is simplified; there can be (and in practice are) numerous components to the server and database discussed above.

## II.     BACKGROUND ON THE PATENTS-IN-SUIT

The patents at issue are the '365 Patent (Ex. 3) and the '066 Patent (Ex. 2). Both patents claim priority to an application filed on September 25, 1995. Both of the asserted patents (as well as others in the family) were reexamined and the Patent Office confirmed the validity of each of the asserted claims with no amendments.

## III.    APPLICABLE LAW

*Phillips v. AWH Corp.* is the seminal case on claim construction. 415 F.3d 1303 (Fed. Cir. 2005) (en banc). Per *Phillips*, claims should be read as having "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the . . . effective filing date of the patent application." *Id.* at 1313. Because a person of ordinary skill in the art is understood to have read the claims, specifications, and file histories of the patents at issue,

*Phillips* holds that statements from such "intrinsic evidence" are given weight when construing claims. *Id*. Only where this Court is unable to determine the meaning of a claim term after considering the intrinsic evidence—the patent and its prosecution history—may it then look to extrinsic evidence to resolve any ambiguity. *Dow Chem. Co. v. Sumitomo Chem. Co., Ltd.*, 257 F.3d 1364, 1373 (Fed. Cir. 2005).

In construing the claims of a patent, the Federal Circuit has repeatedly held that each claim term should generally be given its "ordinary and customary meaning." *Phillips*, 415 F.3d at 1312. To remove ambiguity in this standard, the Federal Circuit last year ruled that there is a "***stringent standard*** for narrowing a claim term beyond its plain and ordinary meaning." *Aventis Pharm. S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1330 (Fed. Cir. 2012) (emphasis added). Citing *Thorner v. Sony Computer Entm't Am. L.L.C.*, 669 F.3d 1362 (Fed. Cir. 2012), the Federal Circuit stated it "will only interpret a claim term more narrowly than its ordinary meaning under ***two circumstances***: '(1) when a patentee ***sets out a definition*** and acts as [its] own lexicographer, or (2) when the patentee ***disavows the full scope of a claim term*** either in the specification or during prosecution.'" *Aventis*, 675 F.3d at 1330 (quoting *Thorner*, 669 F.3d at 1365) (emphasis added). This Court can ***only*** adopt Defendants' narrowed definitions if Defendants can meet one of the two *Thorner* limiting conditions.

Looking at the first condition of the *Thorner* test, "[t]o be his own lexicographer, a patentee must use a special definition of the term [that] is clearly stated in the patent specification or file history." *Laryngeal Mask Co. Ltd. v. Ambu*, 618 F.3d 1367, 1372 (Fed. Cir. 2010) (citations omitted). As *Thorner* holds, "[i]t is not enough for a patentee to simply disclose a single embodiment or use a word in the same manner in all embodiments, the patentee must clearly express an intent to redefine the term." 669 F.3d at 1365 (citations omitted); *see also*

*Abraxis Bioscience, Inc. v. Maybe Pharm. (USA), Inc.*, 467 F.3d 1370, 1376 (Fed. Cir. 2006) (Patentee acted as lexicographer by stating "***by the term*** 'edetate,' ***we mean*** . . ." (emphasis added)).   Where a patentee does not "clearly and precisely define [the] claim term in the specification, the Court gives the term its ordinary and customary meaning."   *Va. Innovation Scis., Inc. v. Samsung Elecs. Co.*, 2013 WL 5410013, at *9 (E.D. Va. Sept. 25, 2013).

Looking at the second condition of the *Thorner* test, the patentee must unambiguously disavow claim scope.   "A statement in the prosecution history can only amount to disclaimer if the applicant '***clearly and unambiguously***' disavowed claim scope."   *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1367 (Fed. Cir. 2012) (emphasis added and internal citation omitted).   The patentee cannot disavow claim scope in the specification absent a "clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction, which is necessary to further narrow the claim language."   *Linear Tech. Corp. v. Int'l Trade Comm'n*, 566 F.3d 1049, 1058 (Fed. Cir. 2009) (citing cases); *see also Dealertrack, Inc. v. Huber*, 674 F. 3d 1315, 1327 (Fed. Cir. 2012) ("[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a ***clear indication in the intrinsic record*** that the patentee intended the claims to be so limited." (emphasis added)).

### 1.   Governing Federal Circuit law requires this Court to construe claim terms to have their plain and ordinary meaning in most circumstances.

SPIPG's position is that most of the terms at issue have a plain and ordinary meaning. This is true of the vast majority of claim terms in this case, to be sure.[3]   Using the *Markman* procedure to put new words in place of the words the patentee chose (and that the Patent Office approved) is an aberration from how the words in patent claims are handled.   As the Federal

---

[3] All of the claim terms where the parties have not sought construction carry their plain and ordinary meaning.

Circuit succinctly stated: "Courts do not rewrite claims; instead, **we give effect to the terms chosen by the patentee**."  *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999) (emphasis added).

Recent Federal Circuit decisions reject the use of narrowed constructions where the plain and ordinary meaning of a term suffices.  For instance, in *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, the Federal Circuit affirmed that a judge in this district "did not err in concluding that these terms have plain meanings that do not require additional construction." 2012 WL 3636908, at *10 (Fed. Cir. Aug. 24, 2012).[4]  The Federal Circuit ruled that rejecting the narrow construction offered by the accused infringer resolved the parties' dispute and eliminated the need for further construction.   *Id.* ("ActiveVideo's proposed construction erroneously reads limitations into the claims and the district court properly rejected that construction and resolved the dispute between the parties.").

Similarly, in *Toshiba*, the patent holder (Toshiba) proposed that "each limitation should have been given its plain and ordinary meaning, as recited in the claim itself."  681 F.3d at 1367. The district court rejected Toshiba's construction and narrowly construed the claim terms.   *Id.* The Federal Circuit reversed the district court in light of its holding in *Thorner* because the defendant had not proved that either of the two limiting conditions (express definition or unambiguous surrender of claim scope) were met, and instructed the district court to follow the "plain language of the claim" on remand.[5]  *Id.* at 1369.

---

[4]  This was especially true because the construction proposed by the accused infringer (ActiveVideo) was "confusing, unhelpful, add[ed] no clarity to the claim language itself, and [was] erroneous to the extent [they] attempt[] to narrow the claims."  *ActiveVideo*, 2012 WL 3636908, at *10.

[5]  In addition to *Thorner*, *Aventis*, *Toshiba* and *ActiveVideo* discussed above, several times last year, the Federal Circuit has held that a claim term's plain and ordinary meaning controls.  *See, e.g.*, *Smartmetric Inc. v. Am. Exp. Co.*, 2012 WL 1367398, at *2 (Fed. Cir. Apr. 11, 2012)

2. **The Eastern District of Virginia also requires this Court to construe claim terms to have their plain and ordinary meaning in most circumstances.**

A string of recent Eastern District of Virginia cases have held that patent claim terms can (and typically should) hold their ordinary and customary meaning. Where a patentee fails to "clearly and precisely define [the] claim term in the specification, the Court gives the term its ordinary and customary meaning." *Va. Innovation Scis.*, 2013 WL 5410013, at *9. Judges in this District also have declined to construe a term beyond its plain and ordinary meaning where the proposed definitions only added redundancy and provided no additional clarity for the jury. *N5 Techs. LLC v. Capital One N.A.,* 2013 WL 5876978 (E.D. Va. Oct. 29, 2013). And of course the prior case involving the patents-in-suit, *ICTI v. Vivox*, followed *Thorner* and construed many terms to have their plain and ordinary meaning. Ex. 1, 2012 WL 5331573 at *10-15, Op. at 25.

3. **This Court should defer to its prior rulings relating to these patents.**

Prior *Markman* rulings should be given "deferential treatment **unless clearly erroneous**" and applied "absent a showing by plaintiff that the court's original construction of a disputed term was **incorrect as a matter of law**." *DE Techs., Inc. v. ISHOPUSA, Inc.*, 826 F. Supp. 2d 937, 941 (W.D. Va. 2011) (emphasis added). Here deference applies because, just last year, this Court construed terms in both the '365 and '066 Patents. *See* Ex. 1, *ICTI*, 2012 WL 5331573. This Court expressly considered several terms at issue here in the *ICTI v. Vivox* case, including "point to point" and larger phrases using that term. *Id.* **SPIPG proposes the same definition as this Court adopted in the previous case for each term**. In following the previous determinations, SPIPG draws upon the analysis already performed, giving the ruling deferential

---

(adopting the accused infringers' construction would "deviate from the term's plain and ordinary meaning, conflict with the specification, and erroneously rewrite the claims"); *Woods v. DeAngelo Marine Exhaust, Inc.*, 2012 WL 3683536, at *8 (Fed. Cir. Aug. 28, 2012); *Meyer Intellectual Props. Ltd. v. Bodum, Inc.*, 2012 WL 3329695, at *12 (Fed. Cir. Aug. 15, 2012) ("After careful review of the intrinsic evidence, we find that nothing in the claim language or the patent specification limits the 'providing' step to a specific party.")

treatment and decreasing the burden on this Court.  For the remaining terms, and in light of the Federal Circuit's recent case law (*Thorner*, *Aventis*, *Toshiba*, *ActiveVideo*, etc.) strongly favoring a plain and ordinary meaning unless two specific conditions are met, SPIPG simply proposes allowing the "plain and ordinary meaning" of the patents' clear words to control.

## IV.   TERMS IN DISPUTE

Defendants in this case cannot agree among themselves on which terms must be construed or which best "clarify the issues."  Instead, each uses claim construction to read self-serving non-infringement arguments into the claims.  A summary of Defendants' scattered constructions shows the mismatch and points of disagreement, as well as this Court's prior positions on the claims at issue:

| Term | Bandwidth | Vocalocity | Telesphere | Judge Doumar |
|------|-----------|------------|------------|--------------|
| "point-to-point" | | | Proposes Construction | Adopted SPIPG's construction |
| "point-to-point communication" | Proposes Construction | Proposes Construction | | Reasoned that the construction of "point-to-point" eliminated need to construe terms related to "point-to-point" communication |
| "process" | Proposes Construction | Proposes Construction | Telesphere did not seek construction of this term (Ex. 8) but, oddly, discusses it in its brief. | Adopted SPIPG's construction |
| "Internet" | | | Proposes Construction | N/A |

| Term | Bandwidth | Vocalocity | Telesphere | Judge Doumar |
|---|---|---|---|---|
| "point-to-point Internet communication"<br><br>"point-to-point communications over the Internet"<br><br>"point-to-point communications … through the Internet" | Proposes Construction, but different than Vocalocity | Proposes Construction, but different than Bandwidth | | Reasoned that the construction of "point-to-point" eliminated need to construe terms related to "point-to-point" communication |
| "connection server" | Proposes Construction | Proposes Construction | | Utilized "connection server" in construction of "point-to-point" without further defining the term |
| "using the connection server" | Proposes Construction | | | Utilized "connection server" in construction of "point-to-point" without further defining the term |
| "database" | Proposes Construction | | | Accepted parties' position this term did not require further construction |
| "processing unit(s)" | Proposes Construction | Proposes Construction | | N/A |

Defendants' disorganized efforts to craft non-infringement arguments using claim construction cannot trump the careful effort the inventors put into describing their innovation.  SPIPG asks this Court to permit the claims to retain their plain and ordinary meaning.

### 1. "point-to-point" and "point-to-point … communication" ('066 and '365 patents)

| SPIPG | DEFENDANTS | DEFENDANTS' PROBLEMS |
|---|---|---|
| "communications between two processes over a computer network that are not intermediated by a connection server" | Vocalocity & Bandwidth:<br>***point-to-point … communication***:<br>"communication between two *client* processes, *established by one of the processes using the network protocol address of the other process,* that is not intermediated by a connection server"<br><br>Telesphere:<br>***point-to-point***:<br>A point-to-point communication is a "communication between two *client* processes, *established by one of the processes using the network protocol address of the other process,* that is not intermediated by a connection or an address server" | This Court held in *Innovative Commc'n Techs., Inc. v. Vivox, Inc.*, "that the ordinary and customary meaning of the term 'point to point' … as understood by a person of skill in the art at the time of invention, is 'communications between two processes over a computer network that are not intermediated by a connection server.'" Ex. 1, 2012 WL 5331573, at *10, Op. at 16 (E.D. Va. Oct. 26, 2012).<br><br>Defendants' construction requires communication be established in a certain way (by a process and using a certain type of address) wanders far from an ordinary meaning of "point-to-point," is inconsistent with the claims, and has no basis in the patent or its file history.<br><br>Defendants' construction, which limits "point-to-point" communication only to communications that take place between "clients," cannot be right—the word "clients" does not even appear in the patents. |

All parties appear to agree that a connection server is what SPIPG suggests: "communications between two processes over a computer network that are not intermediated by a connection server."[6]  This definition was also adopted by ***this Court*** in *ICTI v. Vivox.*  Ex. 1,

---

[6] The parties do not appear to dispute the portion of the definition that says the "communications … are not intermediated by a connection server <u>or an address server."</u>  SPIPG chose its construction because it was consistent with the Court's ruling in *ICTI v. Vivox*, 2012 WL 5331573, at *10, Op. at 16.  That Court recognized (and SPIPG agrees) that the addition of "or an address server" adds no additional limits to the claim.

2012 WL 5331573, at *10, Op. at 16.  Beyond this point of agreement, Defendants appear to attempt to narrow the claims in two ways, both of which violate *Thorner*.

>	*First*, Defendants attempt to limit the term "point-to-point" to only those communications "established" or initiated in a certain way (specifically, "by one of the processes" and then "using the network protocol address of the other process").  The Defendants in *ICTI v. Vivox* sought a similarly limiting interpretation.  After reviewing the patent, prosecution history and extrinsic evidence, this Court rejected any such limit, reasoning that: "Nowhere in the specifications has the patentee acted as its own lexicographer and clearly defined 'point-to-point.'  Nor has the patentee clearly disavowed the full scope of the claim language."  Ex. 1, *ICTI*, 2012 WL 5331573, at *7, Op. at 11.  This Court rejected Defendants' argument, first, because it is "redundant and adds nothing to the construction of the term 'point to point'" and, second, because "the prosecution history upon which the defendants rely contains no clear and unmistakable disclaimer of the full scope of the claim language."  Ex. 1, *Id*. at *9, Op. at 14-15 (citing *Thorner*, 669 F.3d at 1366-67).  Similarly here, the phrase "established by one of the processes using the network protocol address of the other process" does not appear in the patents or file histories.  Accordingly, there can be no lexicography or clear disavowal and, under *Thorner*, this Court should not limit the claim.

>	*Second*, Defendants try to narrow the term "point-to-point" by incorporating a requirement relating to *what* must communicate.  Defendants say only "client[s]" can communicate in point-to-point communications.  This construction flies in the face of the claim language.  Claim 1 of the '365 Patent is clear that *processes*—not clients—participate in point-to-point communication.  Ex. 3, '365 Patent (claim 1) ("and to allow the establishment of a packet-based point-to-point communication between said one of the *processes* and one of said

other **processes**" (emphasis added)).   In claim 1 of the '066 Patent **processing units**—not

clients—participate in the point-to-point communication.   Ex. 2, '066 Patent (claim 1) ("for

establishing a point-to-point communication link between the first and second **processing**

**units**").   The specifications also discuss point to point communication between processes and

processing units.   *See, e.g.*, Ex. 2, '066 Patent Fig. 3.   Meanwhile, the word "client" does not

appear in either patent.   To change the definition of "point to point" to say "client" would (1)

read out clear claim language and (2) be inconsistent with the specifications.

Construing claims is simply a way of clarifying normally terse claim language in order to

understand and explain, but not to change, the scope of the claims.   *Terlep v. Brinkmann Corp.*,

418 F.3d 1379, 1382 (Fed. Cir. 2005).   SPIPG's construction should be adopted because it does

not change the scope of the claims.   Defendants' construction, however, should be rejected for

narrowing the scope of the claims in violation *Terlep* and *Thorner*.

**2.  "process" ('365 Patent)**

| SPIPG | DEFENDANTS | DEFENDANTS' PROBLEMS |
|---|---|---|
| "a running instance of a computer program or application"<br><br>Telesphere: No construction proposed. | Bandwidth & Vocalocity: Indefinite; to the extent the term can be construed, a "process" is "an addressable program running on a user device" | The parties agreed in *ICTI v. Vivox*, that the term "process" means "a running instance of a computer program or application."  Ex. 1, 2012 WL 5331573, at *2, Op. at 3.<br><br>The term is not indefinite because Defendants cannot meet the high burden required to prove indefiniteness.<br><br>Defendants use "process" (an allegedly indefinite term) in their proposals for other claim terms.<br><br>The plain and ordinary meaning of "process" does not: (1) require that a process be an "addressable program" or (2) pertain to a "user device." |

Defendants' argument that the term "process" is indefinite has no basis.   Under the definiteness requirement—which does not require absolute clarity—only claims that are "'not amenable to construction' or 'insolubly ambiguous' are indefinite."   *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005).   The Federal Circuit has set a "high bar" for finding a claim term indefinite.[7]   *Univ. of Va. Patent Found. v. Gen. Elec. Co.*, 755 F. Supp. 2d 709, 727 (W.D. Va. 2010) (finding the bar not met where the claim terms are "amenable to the constructions adopted.").   And the question to be considered is "whether one of ordinary skill in the art would understand what is claimed when the claim is read in light of the specification." *BJ Servs. Co. v. Halliburton Energy Servs., Inc.*, 338 F.3d 1368, 1372 (Fed. Cir. 2003).   Here the term "process" is far from "insolubly ambiguous."   In fact, all four parties in the *ICTI v. Vivox* litigation were able to unanimously agree on the construction of the term "process" and the Court acknowledged as much.[8]

What is more, Defendants use this allegedly indefinite term to define another disputed term: "point to point."   Specifically, Defendants Telesphere and Bandwidth define "point to point" as "a communication between two client ***processes***, established by one of the ***processes*** using the network protocol address of the other ***process***, that is not intermediated by a connection

---

[7] The standard for holding a claim term indefinite is clear and convincing evidence.   *See Datamize*, 417 F.3d at 1347-48 ("By finding claims indefinite only if reasonable efforts at claim construction prove futile, we accord respect to the statutory presumption of validity and we protect the inventive contribution of patentees, even when the drafting of their patents has been less than ideal. In this way we also follow the requirement that clear and convincing evidence be shown to invalidate a patent.").

[8]   In the previous case involving these patents, all parties unanimously agreed on the plain and ordinary meaning of the term "process" is "a running instance of a computer program or application." Ex. 1, *ICTI*, 2012 WL 5331573, at *2, Op. at 3.   SPIPG now proposes that same construction.

or an address server."[9]   By using "process" in their own definition, Defendants implicitly acknowledge that "process" is entirely understandable to one of ordinary skill in the art.

In the alternative to indefiniteness, Defendants' proposed definition imputes unnecessary and unsupported limitations into the term.   Under Defendants' proposed construction, "process" requires an "addressable program" that runs on a "user device."   There is simply no support for these limits—***the terms defendants suggest this Court write in place of process ("addressable program" and "user device") are never used in the claims, specifications or file histories for the patents in suit***.   *See, e.g.*, *MBO Labs, Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1330-31 (Fed. Cir. 2007) ("[W]e cannot endorse a construction analysis that does not identify a textual reference in the actual language of the claim with which to associate a proffered claim construction.") (emphasis added).   Defendants' repeated attempts to insert unfounded limitations are improper and directly contradict the holding in *Thorner*.   This Court should interpret "process" consistent with its prior construction and the one SPIPG suggests.

**3.**   **"Internet," "point-to-point Internet communication," "point-to-point communication over the Internet," and "point-to-point communication link between the first and second processing units through the Internet." ('365 and '066 Patents)**

---

[9] Vocalocity defines the term similarly, simply substituting the term "user" for "client."

| SPIPG | DEFENDANTS | DEFENDANTS' PROBLEMS |
|---|---|---|
| No construction necessary as these terms have a plain and ordinary meaning | **Telesphere:**<br>***Internet***: "The global system of interconnected networks whose Internet Protocol addresses and Domain Name System are administered by the Internet Corporation for Assigned Names and Numbers (ICANN)"<br><br>Vocalocity:<br>***point-to-point Internet communication***, ***point-to-point communications over the Internet***, and ***point-to-point communication link between the first and second processing units through the Internet***: "point-to-point communications over the Internet"<br><br>Bandwidth:<br>***point-to-point Internet communication***, ***point-to-point communications over the Internet***, and ***point-to-point communication link between the first and second processing units through the Internet***: "point-to-point communication over the Internet in which each point is associated with a terminating network protocol address" | The patents-in-suit make clear that " Internet" has a plain and ordinary meaning.<br><br>Defendants' construction is nonsensical because it limits the patents-in-suit to global networks administered by ICANN—an organization that was not formed until *three years after* the priority date of the patents-in-suit.<br><br>Taking the words of the claim and substituting in different words is not the purpose of claim construction.<br><br>There is no lexicography or clear disavowal of the limitation "in which each point is associated with a terminating network protocol address" as this phrase never appears in the patent or its file history. |

There is no need for this Court to depart from the plain and ordinary meaning of the term "Internet." Defendants seeks to artificially limit the scope of the term "Internet" (and other limitations utilizing the term "Internet"), even though they cannot agree on what those narrowing limitations should be. Telesphere stands alone in its proposed construction of "Internet," suggesting that point-to-point communication can only occur over a "global system of

17

interconnected computers whose Internet Protocol addresses and Domain Name System are admitted by . . . ICANN."  Bandwidth and Vocalocity seek to implicitly construe this same term with baseless narrowing limitations related to particular forms of point-to-point communication (and even they don't agree).  Regardless, there is no basis under *Thorner* to limit "Internet" in the manner Defendants propose.

To start, the specification of the '066 Patent makes clear that the term Internet has a plain and ordinary meaning—it basically refers to addressing schemes utilizing Internet Protocol (IP) addresses and explains how it is used.  *See, e.g.*, Ex. 2, '066 Patent col.2 ll.6-10 (describing the invention as "[a] point-to-point ***Internet*** protocol is disclosed which ***exchanges Internet Protocol (IP) addresses***" (emphasis added)).  The '066 Patent specification further provides that the Internet relates to "devices interfacing ***to the Internet*** and other online services . . . upon establishing respective device addresses" including "***one type of device address***" known as "the ***Internet Protocol (IP) address***."  *Id.* at col.1 ll.32-37 (emphasis added).  This is rendered self-evident by the asserted claims.  Claim 1 teaches a "method for ***establishing point-to-point Internet*** communication comprising the steps of ***storing in a database a respective Internet Protocol (IP address)*** of a set of processing units" and, on demand, "***retrieving the IP address*** of [a] second unit from the database" for the purpose of "***establishing a point-to-point communication*** link between the . . . processing units ***through the Internet***."  *Id.* col.12 ll.7-20 (Claim 1).  Thus, in view of the claims and specification of the '066 Patent, it is clear that a communication "through the Internet" is exactly what one might expect: communication established by locating and using the IP address of processing units as spelled out in each claim. Since the claims spell this out plainly, no construction of "Internet" is needed to clarify the

claims. Defendants' proposed importation of explicit and implicit definitions of "Internet" cannot meet the stringent standard set by *Thorner* and its progeny.

*First*, Telesphere seeks to limit the term "Internet" to a "global system of interconnected networks." But there is nothing in the patents-in-suit defining "Internet" or disavowing other types of communication—in fact ***the phrase "global system of interconnected networks" never appears in the claims, specification, or prosecution history of the patents-in-suit***. *See, e.g.*, *MBO Labs*, 474 F.3d at 1330-31. In short, there is nothing limiting the term "Internet" as Telesphere proposes.

*Second*, Telesphere attempts to limit "Internet" to a specific network with addresses administered by ICANN. Telesphere's construction on this point defies controlling Federal Circuit law. *Phillips v. AWH Corp.* is the seminal case on claim construction. 415 F.3d 1303 (Fed. Cir. 2005) (en banc). Per *Phillips*, claims should be read as having "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the . . . effective filing date of the patent application." *Id*. at 1313. Here, the patents' effective filing date is in 1995. Telesphere proposed that the term Internet can only possibly mean a "global system of interconnected networks whose . . . addresses . . . are administered by . . . ICANN." (Ex. 8, Telesphere Construction Proposal at 1). This construction is, in a word, impossible. ICANN was ***founded in September 1998***—nearly three years after the dates on the patents-in-suit.[10] The notion that the patents-in-suit claim ***only*** point-to-point communications whose addressing is "administered" by an organization that did not exist at the effective filing date of the patents-in-suit is farcical, defies controlling caselaw, and reveals Telesphere's construction as a *post-hoc* ploy to evade infringement by imposing indefensible limitations on otherwise clear terms.

---

[10] *See* Ex. 9, California Corporate Registration Record for ICANN.

Bandwidth and Vocalocity's constructions are equally incorrect.   To start, Vocalocity attempts to entirely rewrite the claims.    For instance, for claim term, "point-to-point communication link between the first and second processing units through the Internet," Vocalocity asks this Court to cross out words, change words, and add words for no reason at all:

> "*point-to-point communication[s] ~~link between the first and second processing units through~~ [over] the Internet,*"

There is simply no basis to re-write the words the inventors chose and the Patent Office approved.

Bandwidth additionally attempts to import narrowing limitations related to point-to-point Internet communications into the '066 Patent to further require "a terminating network protocol address."  This fares no better.  The term "network protocol address" does appear in the '365 Patent but does not appear in the '066 Patent.   In short, Bandwidth cannot import "network protocol address" into the '066 Patent even though that term ***does not appear in its claims, specification, or prosecution history***. *MBO Labs*, 474 F.3d at 1330-31.  Moving forward in its proposal, it is not clear what Bandwidth intends to invoke with the term "*terminating* network protocol address."   SPIPG has no idea what "terminating" means here (which is unhelpful since claim construction is designed to eliminate—not create—uncertainty).   ***Similarly, the term "terminating" cannot limit the claims because it does not appear even once in the intrinsic record***.[11]  *Id.*

Because Defendants cannot satisfy either prong of the *Thorner* test for the litany of limitations each separately attempts to read into the '006 Patent, there is no basis for this Court to

---

[11] While the word "terminate" does appear twice in the specification, it bears no relevance and relates solely to the process of allowing a user to "terminate the point-to-point communication link by . . . activating an [END] button" or the like.  Ex. 2, '066 Patent at col.9 ll.16-24.

depart from the plain and ordinary meaning of the term "Internet" or its related limitations in the many ways Defendants propose.

### 4. "connection server" ('365 and '066 Patents)

| SPIPG | DEFENDANTS | DEFENDANTS' PROBLEMS |
|---|---|---|
| No construction necessary as this term has a plain and ordinary meaning<br><br>Telesphere: No construction proposed. | Vocalocity & Bandwidth: "a server that furnishes a network protocol address needed to establish communications" | Defendants' attempt to rewrite a straightforward 2-word phrase into a confusing 13-word phrase.<br><br>The Defendants' construction attempts to import limitations from the '365 Patent into the '066 Patent.  It thus changes the substance of the '006 Patent.<br><br>The Defendants' proposal renders the claims nonsensical.<br><br>The Defendants' proposal seeks to import limitations in violation of *Thorner*. |

With their construction, Defendants' attempt to rewrite a simple term: "connection server."   This term is a straightforward server that facilitates connection—no construction is necessary.   Defendants meanwhile need 13 words to make their point.   Construing claims is a way of clarifying normally terse claim language in order to understand and explain the scope of the claims.   *See Terlep*, 418 F.3d at 1382.   Because Defendants' construction fails to clarify claim language, it should be rejected.

***First***, Defendants' construction seeks to add limitations from the the '365 into the '066 Patent.   The '365 Patent and the '066 Patent are in the same family.   But, as would be expected, they are not identical inventions.   Specifically, the term "network protocol address" appears in the '365 Patent claims but not in the '066 Patent claims.   By adding the phrase "network protocol address" to their definition of "connection server," the Defendants' have imported the limitation of a "network protocol address" into a claim where it otherwise would not appear.   ***To be sure, the term "network protocol address" does not appear in the claims of the '066 Patent and***

21

*adopting Defendants' construction simply adds the term "network protocol address" to the claims of the '066 Patent*.  Defendants' construction thus inappropriately rewrites the claims of the '066 Patent.  Claim constructions may clarify claim language in order to understand and explain the scope of the claims, but cannot change the scope of the claims.  *See Terlep*, 418 F.3d at 1382.  Adding "network protocol address" changes the scope of the claims in a way not supported by the words of the claims.  *See Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002) ("[T]he claim construction inquiry [] begins and ends in all cases with the actual words of the claim.").

Additionally, Defendants' proposed change would render the claims nonsensical.  The claims of the '006 Patent discuss an IP address.  Adding network protocol address into the claims would cause confusion.  For example, element (c) of '066 Patent claim 1 as rewritten by Defendants would be: "retrieving *the IP address* of the second unit from the database using 'a server that furnishes *a network protocol address* needed to establish communications'" (emphasis added).  The claim as rewritten by defendants makes no sense—it recites *two different kinds of addresses* in the same claim.

Finally, the Defendants' construction attempts to narrow the claims by introducing language that is not supported by the intrinsic evidence.  *The phrase "needed to establish communication" cannot be a proper construction because it is never used to define a connection server or network protocol address in the patents, their prosecution history, or even the claims*.  *MBO Labs*, 474 F.3d at 1330-31.  Instead, the '365 and '066 Patents themselves are entitled "Establishing A Point-to-Point Communication" because the inventions disclosed in the patents recite a variety of ways to establish the final point-to-point communication.  Then, unsurprisingly, the patents themselves disclose many patterns of communication.  For example,

22

the patents describe "retrieving the IP address of the second unit from the database using the connection server, … , for establishing a point-to-point communication link between the first and second processing units through the Internet."  *See* Ex. 2, '066 Patent at Abstract; Ex. 3, '365 Patent at col. 2 ll.32-37.  In such an example, neither the IP address nor the connection server is described is being needed to establish communication.  Instead, the process of retrieving the IP address is one step "for establishing" a point-to-point communication.  In short, the limitations defendants' propose are more limited than even the embodiments described in the patents.  The intrinsic evidence, thus, does not support importing into the claims language specifying that either the connection server or a network protocol address is needed to establish communication.

Defendants propose a string of limitations to add to the straightforward term "connection server."  Since they nowhere point to a clear disavowal or an instance of lexicography, under *Thorner*, this Court cannot so limit the term.

### 5. "using the connection server" ('066 Patent)

| SPIPG | BANDWIDTH | BANDWIDTH'S PROBLEMS |
|---|---|---|
| No construction necessary as this term has a plain and ordinary meaning<br><br>Vocalocity & Telesphere: No construction proposed. | Bandwidth: "the connection server directly accesses the database to perform the act recited in the respective claim, as opposed to accessing remote or distributed databases through other intermediating servers" | Bandwidth's construction seeks to redefine the word "using" without support in the specification.<br><br>Bandwidth's construction confuses the jury because when the construction is used in place of the term being construed, the claim is gobbledygook.<br><br>The ordinary meaning of "using the connection server" has nothing to do with databases.<br><br>Bandwidth cannot show that the patentee explicitly defined "using the connection server" to exclude remote/distributed databases, nor that the patentee disavowed remote/distributed databases.  To the contrary, the patents discuss using databases in all sorts of manners. |

Because Bandwidth uses the words "**connection server**" in its definition of "using the **connection server**," the only words left to define in the phrase at issue are "using the …." Bandwidth's thus proposes that the phrase "using the … " means 24 words: "directly accesses its database to perform the act recited in the respective claim, as opposed to accessing remote or distributed databases through other intermediating servers."   As explained in further detail below, there is no basis for this Court to depart from the plain and ordinary meaning of the term "using" by adopting Bandwidth's construction.

Bandwidth's construction renders unintelligible the claims in which the phrase "using the connection server" appears.  For example, Claim 1(c) of the '066 Patent recites:

> retrieving the IP address of the second unit from the database **using the connection server**, in response to the determination of a positive on-line status of the second processing unit, for establishing a point-to-point communication link between the first and second processing units through the Internet.

Substituting Bandwidth's proposed construction yields:

> retrieving the IP address of the second unit from the database the connection server **directly accesses its database to perform the act recited in the respective claim, as opposed to accessing remote or distributed databases through other intermediating servers in response to the determination of a positive on-line status of the second processing unit**, for establishing a point-to-point communication link between the first and second processing units through the Internet

(emphasis added).[12]  This certainly does not clarify the claims.

--------

[12] Further, when factoring in Bandwidth's proposed constructions of "connection server" above and "database," discussed below things get more confusing, and results in the gobbledygook that follows:

> retrieving the IP address of the second unit even from the database the a server that furnishes a network protocol address needed to establish communications directly accesses its an organized collection of information included in or directly accessible by the a server that furnishes a network protocol address needed to establish communications, without intermediation by other servers to perform the act recited in the respective claim, as opposed to accessing remote or distributed

Bandwidth's construction also fails to comport with the intrinsic evidence.  First, the definition Bandwidth proposes includes a negative limitation: "as opposed to accessing remote or distributed databases through other intermediating servers."  The phrase "using the connection server" says nothing about a database. But even moving beyond this obvious error, Bandwidth's construction still violates *Thorner* because the '066 Patent does not disavow using remote or distributed databases (through other intermediating servers).  *See* 669 F.3d at 1365.  To the contrary, the '066 Patent does not distinguish between directly accessed databases and remote or distributed databases.  *See, e.g.*, Ex. 2, '066 Patent, col.3, ll.54-55 ("[t]he database may be a SQL database available from Oracle or Informix.").  The specification is replete with discussion of the connection server interacting with a database and in no case does it disavow remote or distributed databases:

- "retrieving the IP address of the second unit from the database using the connection server" *Id*. at col.2, ll.17-19;

- "The connection server 26 then stores these addresses in the database 34 and timestamps the stored addresses using timer 32."  *Id*. at col.5, ll.65-67;

- "… is processed by the connection server 26 to be established in the database 34 as an active on-line party" *Id*. at col.6, ll.7-9;

- "The connection server 26 then searches the database 34 to determine whether the callee is logged-in …" *Id*. at col.6, ll.10-11;

- "The connection server 26 may be instructed to update the user's information in the database 34 by an off-line message."  *Id*. at col.6, ll.51-53.

---

an organized collection of information included in or directly accessible by the a server that furnishes a network protocol address needed to establish communications, without intermediation by other servers through other intermediating servers in response to the determination of a positive on-line status of the second processing unit, for establishing a point-to-point communication link between the first and second processing units through the Internet.

In light of this intrinsic evidence, it is unsurprising that Bandwidth is alone in attempting to limit the claims by excluding a connection server that uses remote or distributed databases. Vocalocity and Telesphere do not join in this construction, nor do Vocalocity and Telesphere join in Bandwidth's construction of "database" (discussed below) which similarly attempts to exclude remote or distributed databases.

Because Bandwidth cannot show that the patentee set out a definition for "using the connection server," or disavowed using a connection server with remote or distributed databases, under *Thorner*, its construction should be rejected. Thus, this Court should find that the term "using the connection server" has its plain and ordinary meaning.

### 6. "database" ('066 Patent)

| SPIPG | BANDWIDTH | BANDWIDTH'S PROBLEMS |
|---|---|---|
| No construction necessary as this term has a plain and ordinary meaning.<br><br>Vocalocity & Telesphere: No construction proposed. | Bandwidth: "an organized collection of information included in or directly accessible by the connection server, without intermediation by other servers" | The plain and ordinary meaning of "database" does not: (1) require that a database be "directly accessible" or (2) have any connection to the concept of point-to-point communication or "intermediation." |

SPIPG, Telesphere, and Vocalocity agree that "database" is an entirely straightforward term that does not require additional construction.[13]   Bandwidth meanwhile proposes a construction of "database" in an effort to manufacture a non-infringement position by imposing undue restrictions on an otherwise unambiguous term.  Bandwidth argues that a "database" can **only** be an "organized collection of information" that is "directly accessible . . . without

---

[13] Notably, in prior litigation involving the patents-in-suit after initially seeking construction on the term "database" at the *Markman* hearing the "defendants conceded that [this term] . . . need not be construed as [its] meaning is clear based on the plain and ordinary meaning of the term[]." Ex. 1, *Innovative Commc'n Techs.*, 2012 WL 5331573, at *2.  SPIPG believes the approach remains correct today.

intermediation" by a specific type of server (a "connection server").  There is simply no basis under *Thorner* for limiting this straightforward[14] claim term as Bandwidth proposes.

*First*, Bandwidth's construction would narrow the term "database" to only databases ***accessed*** in a certain way.  There is no support in the specification for limiting a database to "information included in or directly accessible by a connection server"—in fact, the words "directly accessible" do not even appear in the specification of the '066 Patent.  And the claims make clear that a connection server need only be "***operatively connected***" to a database.  *See, e.g.,* Ex. 2, '066 Patent at col.12 ll.23-25 (Claim 2) ("(b1) transmitting the query to the connection server ***operatively connected*** to the database and the Internet" (emphasis added)).  Accordingly, importing a narrowing limitation that requires the database to be "directly accessible" flies in the face of the asserted claims.

*Second*, there is no basis to import narrowing limitations related to Bandwidth's proposed construction of "point-to-point" (*i.e.* "without intermediation by other servers") into the term "database."  The relevant claims of the '066 Patent make clear that the claimed "database" is intended to do two things: (1) "stor[e] . . . a respective Internet Protocol (IP) address" and (2) allow for the "retriev[al] [of] the IP address."  *See, e.g.,* Ex. 2,'066 Patent at col.12 ll.10-16 (Claim 1).  Aside from storing and retrieving addresses, the claimed database plays no specific role in facilitating point-to-point communications.  *See id*. at col. 2 ll.11-25 (database involvement in establishing point-to-point communication is limited to "storing in a database a

---

[14] The term database is straightforward, especially when read in view of the '066 Patent specification.  The '066 Patent's guidance on the meaning of this term indicates that a database may be, ***but is not limited to***, a device capable of "storing . . . E-mail and Internet Protocol (IP) Addresses."  Ex. 2, '066 Patent col.3 ll.39-55 (emphasis added).  The specification of the '066 Patent refers to certain exemplary databases, including "an SQL database," but places no limitations on how or where identifiers and addresses must be stored, how they may be accessed, or what intermediation, if any, can occur as the connection server accesses the database.  *Id.*

respective IP address of a set of processing units . . . [and] retrieving the IP address of the second unit from the database using the connection server"). So there is no justifiable basis for importing limitations related to point-to-point communications into this term. In short, defendants' proposed construction is insupportable under the *Thorner* test because the patentee never defined the term "database" and there was no disavowal of databases that were not "directly accessible by a connection server" or capable of operating "without intermediation by other servers" in the claims or specification of the '066 Patent. *See, e.g., MBO Labs, Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1330-31 (Fed. Cir. 2007) ("[W]e cannot endorse a construction analysis that ***does not identify a textual reference in the actual language of the claim*** with which to associate a proffered claim construction.") (emphasis added).

Under *Thorner*, there is no basis for this Court to depart from the default position advocated by the Federal Circuit that this term be "given [its] ordinary and customary meaning as understood by a person of ordinary skill in the art." *Thorner*, 669 F.3d at 1365.

### 7.   "processing unit(s)" ('066 Patent)

| SPIPG | DEFENDANTS | DEFENDANTS' PROBLEMS |
|---|---|---|
| No construction necessary as this term has a plain and ordinary meaning.<br><br>Telesphere: No construction proposed. | Bandwidth: "terminal point end user device"<br><br>Vocalocity: a user device | The plain and ordinary meaning of "processing unit(s)" is simple.<br><br>Defendants' proposed construction imports limitations that are not found in the intrinsic evidence in violation of *Thorner*.<br><br>Defendants' proposed construction ignores the preferred embodiment. |

Defendants' constructions vary widely. Those that have chosen to construe the term "processing unit(s)" have inserted baseless limitations into their proposed construction, essentially attempting to manufacture new claims. And a processing unit is so simple—a unit that runs processes. Thus no construction is needed of this term.

28

Under *Thorner* and its progeny, there are two specific circumstances under which terms can be defined to include narrowing limitations: where the patentee acts as his own lexicographer and where the patentee disavows the scope of the claim. *Thorner*, 669 F.3d at 1365.  Neither is true in this case.  In fact, neither the terms "terminal point" nor "user device"[15] appear ***even a single time*** in the specification.  *See, e.g., MBO Labs*, 474 F.3d at 1330-31 ("[W]e cannot endorse a construction analysis that ***does not identify a textual reference in the actual language of the claim*** with which to associate a proffered claim construction." (emphasis added)).  Given this complete lack of language in the patent and prosecution history, Bandwidth and Vocalocity cannot prove that patentee has defined the term, or disavowed the scope of the claim.

Because the defendants provide no act of lexicography or disavowal in order to limit this term, under *Thorner*, the term should be given its plain and ordinary meaning.


Dated:  December 13, 2013                     Respectfully submitted,

                                              STRAIGHT PATH IP GROUP, INC.

                                              _/s/_____
                                              Sona Rewari (VSB No. 47327)
                                              HUNTON & WILLIAMS LLP
                                              1751 Pinnacle Drive, Suite 1700
                                              McLean, Virginia 22102
                                              Tel.: (703) 714-7512

---

[15] Even under the most charitable read for Defendants of the patent, Defendants' construction attempts to improperly limit the claims to an exemplary embodiment.  The '066 Patent states "[i]n an exemplary embodiment, the system includes a first processing unit for sending at least a voice signal from a first user to a second user." Ex. 2, '066 Patent at col.3 ll.9-11.  This Patent language, and other language discussing a "user," describes what is explicitly described as an "exemplary embodiment."  By requiring the "processing unit(s)" to be rigidly defined as a user device, Defendants—in direct conflict with Federal Circuit law—import the exemplary embodiment as a limitation to the claims.  The Federal Circuit is clear that the specification cannot be used to read limitations into the claims.  *Phillips*, 415 F.3d at 1323.  This improper limitation attempts to displace the unambiguous and plain meaning of the term "processing unit(s)" which requires no construction.

Fax.: (703) 918-4018
srewari@hunton.com

*Counsel for Straight Path IP Group, Inc.*

Of Counsel:
David K. Callahan, P.C.
Alicia L. Shah
P. Daniel Bond
Archit P. Shah
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Phone:  (312) 862-2000
Fax:  (312) 862-2200
david.callahan@kirkland.com
alicia.shah@kirkland.com
daniel.bond@kirkland.com
archit.shah@kirkland.com